Eva MURPHY, Plaintiff,

v.

MIDDLETOWN ENLARGED CITY SCHOOL DISTRICT, Louise Ellison, President of the Board of Education of the Middletown Enlarged City School District, Oscar Sotsky, Edith Weiss, Ruth Kassel, Raymond Wood, George Bagge III, George Sands, Joseph Moran, John Masi, Members of the Board of Education of the Middletown Enlarged City School District, and John Krause, Superintendent of the Middletown Enlarged City School District, Defendants.

No. 79 Civ. 3627 (IBC).

United States District Court, S. D. New York.

Oct. 29, 1981.

---

Charles E. Carter, N.A.A.C.P., New York City, for plaintiff; James I. Meyerson, New York City, of counsel.

Rains & Pogrebin, Mineola, N. Y., for defendants; Joel H. Golovensky, Bruce R. Millman, Mineola, of counsel.

## OPINION

IRVING BEN COOPER, District Judge.

Plaintiff, Eva Murphy (Murphy), a black female high school teacher in the Middletown Enlarged School District ("district"), brings this action pursuant to the 13th Amendment, 14th Amendment, 42 U.S.C. §§ 1981, 1983, 2000d et seq. and 2000e et seq. against the nine members of the board of education of the district, the president of the board of education, the superintendent of the district and the district itself. The gravamen of the complaint is that on three separate occasions the district failed to promote Murphy to administrative positions within the district; once to the position of personnel director and twice to the position of assistant principal.[1] For its part, the district maintains that it only hired the best qualified individual for each position available and that in no wise did race and/or sex become a basis for its failure to select Murphy for any of the positions.

### The Facts

a. Murphy's general background

Murphy completed her secondary education in 1954 and matriculated in the same year at Allen University located in Colum-

---

1. We note that the position of Dean of Girls, a proposed post which was never established and for which Murphy was considered, has been referred to throughout but the merits of that claim will not be considered for we deny plaintiff's belated and cursory application to amend the complaint. See T.T. 551–54; Plaintiff's Post Trial Reply Memorandum, p. 32; Defendants' Post Trial Memorandum, pp. 36–44.

("T.T." refers to trial transcript). *Alexander v. Gardner Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1972); *Pauk v. Board of Trustees of C.U.N.Y.*, 654 F.2d 856 (2d Cir. 1981); *Hudson v. I.B.M.*, 620 F.2d 351, 354 (2d Cir. 1980); *Kaiser v. Cahn*, 510 F.2d 282, 284 (2d Cir. 1974).

bia, South Carolina.[2] She attended there until 1956 when she interrupted her studies to go to work. Murphy was first employed as a secretary by American Machine & Foundry, a company located in Connecticut. After approximately a year and a half she left the firm to work for the New York Department of Social Services as a junior caseworker in New Rochelle, New York.[3] Murphy remained in that post for approximately a year and a half until she was hired by International Business Machines in Kingston, New York. Her initial position at I.B.M. secured in June, 1959, was that of stenographer.[4] She was promoted to secretary in 1961, and in 1962 she received the last increase in compensation although she remained there until August, 1966.[5] The highest level attained by Murphy was a "level 14" secretary at a pay rate of $5,200 a year. Her responsibilities there included making appointments, answering telephones, taking dictation, and training secretarial pool employees in typing, shorthand and other business skills.[6] Her duties did not include the hiring and firing of employees.[7]

Murphy testified that her duties at I.B.M. were within the sphere of an administrative assistant and her exact title was "executive secretary." Notwithstanding the fact that I.B.M.'s records revealed that Murphy made at most $5,200 a year, she asserted that her final and highest rate of annual compensation was approximately $10,000.[8]

Donald Moyer, a witness called by the defendants and an employee with I.B.M. was familiar with the personnel records and practices of the corporation, admitted that he had no specific information regarding the work that managers may have assigned Murphy,[9] but did testify that a person in Murphy's position, a level 14 secretary, would have no responsibility for disciplining others and usually would not have the responsibility of assigning work to other employees.[10] He also stated that in 1966 the position of executive secretary, which Murphy claimed she occupied, carried a level 21 classification. The I.B.M. personnel records revealed that Murphy carried only a level 14 classification.[11]

Upon her resignation from I.B.M. in 1966, Murphy secured employment with the Orange County Board of Cooperative Educational Services as a secretary to the director and then as instructor in data processing and in the use of "business machines."[12]

She testified that during this period of absence from Allen University she took courses at Orange County Community College, Middletown, New York, and Mount St. Mary's, Newburgh, New York, and in 1969 she returned to Allen.[13] Murphy stated that she then spent a year and one summer at Allen, ultimately receiving a Bachelor of Science degree in August, 1971 with a major in business education and a minor in English.[14]

Murphy was first employed by the district in the 1970–71 school year as a regular substitute. She taught non-Regents English and typing at Middletown High School despite her failure at that time to have a bachelors degree.[15] Bernard Courtney (Courtney), principal of the high school, recommended Murphy for a staff appointment and wrote "... Murphy has displayed unusual capability and concern in her work

---

2. T.T. 6.

3. T.T. 6–7.

4. Defendants' Exh. 248.

5. Defendants' Exhs. 242, 248; Court's Exh. 1, par. 27.

6. T.T. 111–12.

7. Court's Exh. 1, par. 28.

8. T.T. 110–11.

9. T.T. 1353.

10. T.T. 1348–49.

11. T.T. 1348–49; Defendants' Exhs. 242, 248.

12. Court's Exh. 1, par. 29.

13. T.T. 9–10.

14. T.T. 10, 146, 149; Plaintiff's Exh. 41.

15. T.T. 11; Court's Exh. 1, par. 30.

with many students of limited social motivation."[16] She was retained for the 1971–72 academic year as a full-time teacher. Even though Murphy had fulfilled her degree requirements, she did not have certification as a teacher from the New York State Education Department.[17] The Education Department would not accept her degree from Allen because it had lost accreditation.[18] Representatives of the district wrote to Allen University, the New York State Department of Education and the local supervisory district on behalf of Murphy in an effort to have her degree recognized. Ultimately, Murphy received permanent certification as a teacher in September, 1973 in the areas of English and commerce.[19]

Beginning in the 1971–72 school year, once employed on a full-time basis, Murphy was assigned by the principal, Courtney, to handle disciplinary related problems of female students—problems such as non-attendance, class cutting, and, at times, personal problems. Murphy performed these duties for four of the six assignable class periods each day, teaching English the remaining two periods.[20]

Courtney, at his deposition, testified that there was always a need for increasing personnel to assist with attendance follow-up, but that it would have been an unavailing request to ask the school board for additional personnel because of financial constraints. Therefore, Courtney assigned Murphy to this disciplinary related function; an appointment Courtney characterized as being similar to those of other teachers to the student yearbook organization or as senior class advisor; that such an appointment necessarily reduced the appointee's other teaching obligations.[21]

Murphy testified that her duties relating to discipline involved handling referrals of students from teachers for such problems as class cutting and non-attendance. According to Murphy, subsequent to her initial meetings with these students, she often became involved in counseling them since their manifest problems were at times caused by deeper seated psychological and social traumas. She further testified that in the area of discipline she performed the same functions as the then "assistant to the principal" of the high school.[22]

While Murphy was fulfilling her teaching and disciplinary duties at the high school, she embarked upon post-graduate studies. She earned sixty-six (66) credits at the State University of New York at New Paltz, receiving in May, 1977 a Master of Science Degree in Education and a Certificate of Advanced Study in Educational Administration and Supervision.[23]

In 1974 the high school itself underwent change. Courtney, returning from a sabbatical, resigned as principal to become supervisor of secondary education for the Middletown schools. At this juncture Robert Palgutta (Palgutta), the vice-principal and acting principal during Courtney's absence, was promoted to principal.[24]

Palgutta testified that during his tenure as acting principal and principal, he instituted several changes at the high school. First, he eliminated the "open campus" policy at the school. This was a policy pursuant to which students were left free to do as they wished when they had no scheduled classes. As the school day became more structured under Palgutta, a new discipline

16. Plaintiff's Exh. 1.

17. T.T. 146–47; Defendants' Exh. 1; Court's Exh. 1, par. 31.

18. T.T. 12. Apparently Allen University lost accreditation as a consequence of the desegregation effects of the Supreme Court's decision in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

19. T.T. 12; Plaintiff's Exhs. 5, 6, 7, 8; 13; Court's Exh. 1, pars. 32, 33, 34.

20. T.T. 13–14; Court's Exh. 1, par. 35.

21. Plaintiff's Exh. 127, pp. 15–17.

22. T.T. 14–19; 1394–95.

23. T.T. 21–22; Plaintiff's Exhs. 43, 50, 51; Court's Exh. 1, pars. 49, 50.

24. T.T. 1054.

system was instituted to reduce the frequency of non-attendance and class cutting incidents. Palgutta described this new discipline system as one in which the student would be on more precise notice of the consequences following any infraction.[25]

Second, Palgutta changed the administrative structure of the high school. He abolished the position of "assistant to the principal" and in its stead created two assistant principal positions. Palgutta testified that these new positions remained predominantly disciplinary related; the functions of the new positions were expanded into non-disciplinary areas.[26]

Third, and among other changes, Palgutta instituted a morning sign-in procedure for teachers. Palgutta testified that this was done in an effort to better account for teachers who were required to be in their homerooms; if a teacher did not "sign-in" on time, the school administrators could readily recognize the problem and assign a teacher to temporary supervisory duty.[27]

Murphy almost immediately ran afoul with Palgutta's signing-in directive. Murphy was reprimanded for lateness, at a minimum ten times in two years.[28] Approximately two and a half months after this new procedure was established, Palgutta reprimanded her in writing and characterized her as the "champ" and stated that she had signed-in less than any of the other teachers.[29] Murphy admitted at trial that on an infrequent basis she did not sign-in on time but stressed that she was never late for school; that many times she would be delayed in the mornings with students or parents who wished to discuss the disciplinary problems in which she was involved.[30]

Not only did managerial and procedural changes occur after Palgutta became principal, Murphy testified that her role at the high school also changed. Allegedly, she was no longer invited to administrative meetings (held each Monday morning) where student problems of the prior week were discussed.[31] Murphy also testified that she did not receive the same "feedback" from Palgutta that she had from Courtney.[32]

Ultimately at the end of the 1975–76 academic year, Murphy was no longer responsible for the disciplinary duties she had previously undertaken. She testified that her responsibilities as disciplinarian were interfering with her functions as a teacher; that she had discussed her difficulties with the superintendent of schools, Dr. John L. Krause (Krause) and Palgutta; and a proposed position, Dean of Girls, was considered so that Murphy could continue her disciplinary functions.[33] Applications for this proposed position were elicited, Murphy applied and was interviewed capably and fairly by her superiors for the post. Due to budgetary constraints the position was never established.[34] Beginning in the 1976–77 school year, Murphy's teaching duties became full-time.[35]

From the first days of her employment with the district, Murphy's daily responsibilities and functions revolved around her duties as a teacher and, until 1976, as disciplinarian. Except for these specifically assigned duties, Murphy did not participate much in the co-curricular and extra-curricular life of the school. In eleven years of

25. T.T. 1067–69.

26. T.T. 1072–73.

27. T.T. 1076–80.

28. T.T. 1094; Court's Exh. 1, par. 56.

29. Defendants' Exh. 16; *See also* Defendants' Exhs. 17, 18, 19, 20. Murphy was not the only teacher who did not sign-in and be reprimanded by Palgutta. Murphy testified that Donald Ziter, a teacher who received one of the positions Murphy applied for, did not sign-in but was not chastised for it. T.T. 287.

30. T.T. 38–39; 180–81.

31. T.T. 173–74.

32. T.T. 179.

33. T.T. 37–39; Plaintiff's Exh. 17.

34. T.T. 43–47 Plaintiff's Exh. 31; Court's Exh. 1, pars. 36, 37, 38, 39, 40, 41, 42.

35. Court's Exh. 1, par. 43.

employment up to and including the present day, she had chaperoned only one basketball game even though she testified that she attended several sporting events. Murphy further testified that she, along with other teachers, did escort the senior class almost every year on their annual trips to local resorts.[36] However, she has never participated in any other form of co-curricular or extra-curricular activity.[37]

In September, 1976 Murphy became certified by the state as a school administrator and supervisor; and in September, 1978 she was certified as a school district administrator.[38] Today she is teaching English on a full-time basis at the high school.

b. The district

The Middletown Enlarged School District, located in Orange County, New York, was created in July, 1957 when a consolidation with an outlying district occurred. This was done pursuant to a New York State master plan with the approval of the State Commissioner of Education.[39]

The district is headed by a board of education which is composed of nine persons who are normally elected by the public to serve staggered five year terms.[40] Only one black person, George Sands, is now on the board. He was designated to fill a vacancy and was subsequently elected to the position.[41]

The district itself is composed of nine school facilities: one high school, a junior high and seven elementary schools. In the 1976–77 academic year, the high school moved into a new building, and grade 9, which had previously been part of the junior high became part of the high school.[42]

During the 1978–79 school year, the last year for which counsel has provided us with statistics of district employment, enrollment and racial makeup, the district employed twenty-two administrators. Of this group, three were black. Two of these black administrators Fred Thornton and William Carter were principals of elementary schools.[43] The high school employed four administrators: a principal, vice-principal and two assistant principals. From 1971 to 1979 none of the administrators at the high school were black.[44] A statistical comparison of the racial makeup of the district's administrators, the student population and work force is noted below.[45]

In addition to the above-mentioned administrators, the district employe district-wide administrators, such as directors of personnel, physical education and pre-kindergarten. Of the twenty-one persons who have held such positions from 1970 to the present two were black, both women.[46]

In the 1978–79 school year, the district had a total enrollment of 6099 students, 1917 of which attended the high school.[47] The population was predominantly white but was represented by various racial and ethnic groups.[48]

36. T.T. 23, 194–97.

37. Court's Exh. 1, par. 54.

38. T.T. 22; Plaintiff's Exhs. 39, 40; Court's Exh. 1, pars. 47, 48.

39. Court's Exh. 1, pars. 2, 3, 4, 5, 6.

40. Court's Exh. 1, par. 7.

41. Court's Exh. 1, pars. 11, 12.

42. Court's Exh. 1, pars. 15(a), 16, 75, 76.

43. Court's Exh. 1, pars. 14, 19. The district employed a total of six elementary school principals, one having the responsibility for two facilities, one junior high principal and one high school principal. Court's Exh. 1, par. 17.

44. Court's Exh. 1, pars. 18, 20.

45. In 1978–79, the three black administrators comprised 13.6% of the 22 total administrators. This compared to 9.4% of the district's student population; 5.5% of the total labor force in Orange County; and 4.7% of the available school administrative work force in New York State. Court's Exh. 1, par. 15.

46. Plaintiff's Exh. 77; Court's Exh. 1, par. 21.

47. Court's Exh. 1, par. 134(a), (b).

48. The composition of the student population of the district for the school years 1978–79, and 1971–72, is as follows:

The district employed a total of 362 teachers during the 1978–79 year. Murphy was one of the 91 teachers at the high school.[49] As with the student population of the district, the teachers were for the most part white, but several minority group members were employed. The relevant statistics are noted below.[50]

The district now has an annual budget of approximately $17,000,000, deriving part of its revenues from federally funded programs [51] under the Elementary and Secondary School Act of 1965,[52] and it has also received federal grants under the Head Start program as well as grants for the education of gifted and talented students.[53]

### c. 1978 personnel director position

The first administrative position which Murphy applied for and did not receive allegedly because of discrimination, was that of director of personnel. This position was originally created in the 1971–72 aca-demic year, but was eliminated before the beginning of the next school year for financial reasons. In 1978 the position was reinstated.[54]

Solicitations for applications were posted at the high school as well as at several universities.[55] Krause, superintendent of schools for the district, testified that over one hundred applications were received.[56] Murphy was one of the applicants.[57]

Krause testified that once the applications were received, he, Kenneth Quick, the business director of the district, and David Trachtenberg, the assistant superintendent for instruction, reviewed the same and narrowed the field to eleven applications for further screening and interviewing.[58]

Of the eleven persons interviewed, nine were in-district employees and white males: Palgutta, the high school principal; Robert Minor, an elementary school principal; Steven Finkelstein, assistant principal at the

1978–79 school year

| Level | White (%) | Black (%) | Hispanic (%) | Other (%) |
|---|---|---|---|---|
| District wide | 81.1 | 9.4 | 8.6 | .8 |
| High school | 82.7 | 10.9 | 5.6 | .9 |
| Elementary | 80.5 | 8.3 | 10.1 | 1.1 |

1971–72 school year

| Level | White (%) | Black (%) | Hispanic (%) | Other (%) |
|---|---|---|---|---|
| District wide | 88.2 | 7.6 | 3.9 | less than 1% |
| High school | 94.3 | 4.5 | 1.2 | (not given) |
| Elementary | 85.9 | 8.6 | 4.9 | less than 1% |

Court's Exh. 1, pars. 134(a), (b), (c); 136(a), (b), (c).

**49.** Court's Exh. 1, pars. 14, 135(a), (b). The figures regarding the number of teachers and administrators which counsel has provided us with is based on a survey conducted in September, 1978. The exact number of teachers and the racial composition of the group may have therefore fluctuated during the year. Court's Exh. 1, par. 14.

**50.** The composition of the faculty of the district during the 1978–79 and 1971–72 school years is as follows:

1978–79 school year

| Level | White (#) | Black (#) | Hispanic (#) | Other (#) |
|---|---|---|---|---|
| District wide | 340 | 15 | 5 | 2 |
| High school | 86* | 3** | (not given) | (not given) |
| Elementary | 133 | 8 | 3 | 0 |

\* Of the 86 white teachers at the high school, 30 were women, and 56 men.

\*\* Of the 3 black teachers at the high school, 2 were women, including Murphy.

Court's Exh. 1, pars. 135(a), (b), (c).

1971–72 school year

| Level | White (#) | Black (#) | Hispanic (#) | Other (#) |
|---|---|---|---|---|
| District wide | 274 | 11 | (not given) | (not given) |
| High school | 70 | 3 | (not given) | (not given) |
| Elementary | 132 | 4 | 1 | (not given) |

Court's Exh. 1, par. 137(a), (b), (c).

**51.** T.T. 557–58; Defendants' Exh. 197, p.1; Court's Exh. 1, par. 13.

**52.** 20 U.S.C. §§ 2701 et seq., 3221 et seq.

**53.** Plaintiff's Exh. 80; Court's Exh. 1, par. 13.

**54.** T.T. 561; Court's Exh. 1, pars. 59, 60.

**55.** T.T. 63–64, 100–06; 561; Plaintiff's Exh. 53.

**56.** T.T. 561.

**57.** T.T. 63; Plaintiff's Exh. 55; Court's Exh. 1. par. 61.

**58.** T.T. 561–62; Court's Exh. 1, par. 61.

high school; Richard Cromie, a department chairman at the junior high; Domenic Leone, coordinator of music; and Kenneth Gray, a chemistry teacher. Two of those interviewed, Douglas Goffman and James Formato, were from outside the district.[59] Of the two remaining applicants (out of the total of eleven) one was Susan Schwartz, a white woman serving an administrative internship in the personnel area with the district; the other was Murphy.[60]

Krause testified that the second step in the procedure used to select the personnel director (after the initial screening) was to conduct interviews with the candidates. Normally he, Quick and Trachtenberg would have interviewed each candidate, but in Murphy's case, Quick was not present at her interview.[61] Krause further testified that questions were asked of each applicant; questions which were designed to elicit the candidate's understanding not only of the "technical" requirements of the position, such as contract administration, collective bargaining and knowledge of tenure and probationary laws, but also of their common sense and practical approach in dealing with personnel matters. Krause concluded with the assertion that "we were just looking for the overall best qualified person to fill these responsibilities." [62]

Murphy admittedly did not recall the specific questions asked of her or her exact responses. She did testify that Krause asked her "a little" about her background and her experiences at I.B.M. and the Board of Cooperative Educational Services (BOCES) were discussed. Murphy also recalled that one question asked concerned how she would handle a personnel problem with a female employee but did not remember her exact response. Further, she could not recall if there was any discussion concerning the interviewing and screening functions of the personnel director.[63]

At the completion of all the interviews Krause, Trachtenberg and Quick, pursuant to their predetermined procedure, independently chose the three "top" candidates.[64] Each of the interviewers chose the same finalists: Susan Schwartz, Douglas Goffman and Domenic Leone.[65]

Krause testified that the next step in the selection process was to have each of the three finalists interviewed by the entire board of education. Beforehand, questions were prepared by Krause, Trachtenberg and possibly George Sands, the chairman of the personnel committee of the board of education, for use at these interviews.[66] Ultimately, Schwartz, Goffman and Leone were interviewed by the entire board with Krause and Trachtenberg also in attendance. At the completion of these conferences, the board members, Krause and Trachtenberg voted for their respective choice by secret ballot. Domenic Leone was their collective choice.[67]

Establishing Murphy's qualifications, or lack thereof, for the position of personnel director (as well as for assistant principal) consumed much of the efforts expended at trial. The parties have stipulated that as of 1978 the personnel director had the following duties: (1) labor contract and negotiation administration; (2) interviewing, screening and recommending candidates for appointments; (3) advising employees on deficiencies and their resolution; (4) maintaining staff records and supplying needed information for budget development; (5) analyzing personnel problems and advising the superintendent of schools on policies concerning any difficulties; and (6) general

59. T.T. 563–64; Court's Exh. 1, pars. 63, 72.

60. T.T. 681–82; Court's Exh. 1, par. 64.

61. T.T. 696–97; Court's Exh. 1, par. 66.

62. T.T. 578; 581–82.

63. T.T. 138–39.

64. T.T. 561–64; Court's Exh. 1, pars. 67, 68.

65. T.T. 563; Court's Exh. 1, par. 68.

66. T.T. 582–83.

67. T.T. 583–84; Court's Exh. 1, par. 70.

responsibility over district wide personnel, supervisory and evaluation programs.[68]

Murphy testified that she was a member of the union representing the teachers at the district but held no office and was not on the negotiating committee of that union;[69] further, that she did have collective bargaining and negotiation experience. As wife of the president of the local chapter of the National Association for the Advancement of Colored People (NAACP) she would accompany persons with labor difficulties to the respective employers in an effort to settle any problems. However, Murphy did not include any reference to collective bargaining or labor negotiation experience in her 1978 resume.[70] On cross-examination Murphy admitted that she had never represented management or a union in a collective bargaining situation and as of May, 1978 had never witnessed such a session.[71]

As to the screening and interviewing of applicants and the observation and evaluation of personnel, Murphy testified that in her role as a disciplinarian she would act as a "referee" between student and teacher and on occasion "evaluate" a teacher's performance in the classroom. However, these evaluations were informal, not of the type which would be placed in a teacher's personnel file or be considered in tenure decisions.[72] Even though Murphy did take a course in the observation and evaluation of teachers in a classroom setting, she in fact had no experience in observing and evaluating teachers in the classroom—an expertise imperative of a personnel director.[73] Mur-

phy also admitted that her last interviewing and screening experience was for her college sorority.[74]

Both positions Murphy applied for required some degree of business acumen, but it was especially important for the personnel director; after all, payroll costs accounted for seventy-five (75) percent of the district's $17,000,000 annual budget.[75] Murphy testified that she possessed the necessary business skills and cited her undergraduate degree, her work as a social worker, employment as a secretary, and her teaching experience at Orange County Community College and the Orange County Board of Cooperative Educational Services.[76] She concluded:

> . . . [B]ut all of this, being in business the number of years that I had and dealing with the public, landlords, welfare agents, tenants, you name it, I just felt that I had the background and credentials that would, where I would be suited for personnel director.[77]

Prior to his appointment to the post of personnel director, Domenic Leone (Leone) had served as coordinator of music, a district-wide administrative position, for the previous seven years.[78] He was first hired by the district in 1967 as a music teacher, graduating *cum laude* from the State University College at Fredonia with a Bachelor of Science degree in education. He received a Masters of Science degree in 1971 from Queens College, and in the same year the school district promoted him to

---

**68.** T.T. 567–70; 806–09; Plaintiff's Exh. 83; Court's Exh. 1, par. 65.

**69.** Court's Exh. 1, par. 53.

**70.** T.T. 116–20.

**71.** T.T. 122. On direct examination at trial, Murphy identified collective bargaining as follows:

Q. By the way, can you tell me what collective bargaining is?
A. I think so.
Q. Please.
A. All right. Collective bargaining is that one group agrees on one thing and the other group agrees on the other part, and you kind

of compromise on what you ultimately want. That is the best way I can put it.
T.T. 120.

**72.** T.T. 100–01; 203–04.

**73.** T.T. 133–34; Court's Exh. 1, par. 55.

**74.** T.T. 140–41.

**75.** T.T. 557–58.

**76.** T.T. 65–68.

**77.** T.T. 66.

**78.** Court's Exh. 1, par. 72.

coordinator of music.[79] In fulfilling his duties as coordinator of music, Leone testified that he was responsible for curriculum development, scheduling of courses, development of budgets, and evaluations of teachers.[80]

Addressing himself specifically to curriculum, Leone testified that when he first received the music position he was concerned about the curriculum; that he developed a program of instruction for all levels—kindergarten to 12th grade; and that this curriculum is "very much" used today. A thirty-eight page typed document was introduced into evidence outlining the curriculum Leone developed.[81]

The record also reveals that Leone had experience in observing and evaluating teachers. He testified that as coordinator of music he was required to evaluate teachers, select persons for the staff and make recommendations regarding tenure. Several evaluation forms completed by Leone were also introduced into evidence.[82]

Aside from his duties as coordinator of music, Leone testified that he had labor negotiation experience; that he had been co-chairman of the salary committee representing the teachers at the district, and had served on the negotiating committee of the administrators' association.[83]

In 1975, on sabbatical from the district, Leone attended the State University of New York at Albany completing his course work and oral examinations for his doctoral degree in education. He has not yet received this degree, for he is now in the process of writing his dissertation.[84] When Leone applied for the director of personnel position, he possessed certification as school administrator and supervisor and as school district administrator.[85]

The record reveals that Leone was considered highly by his superiors for the work he did as a teacher and as coordinator of music.[86] When Leone was considered for the personnel director's post, Krause considered him "highly qualified" for the position. So overwhelming were Leone's qualifications for the post that Murphy testified it would not be "irrational or a mistake" for someone to consider Leone better qualified than herself for the personnel director's position. She characterized the choice as being "subjective." [87] However, Murphy felt, and still feels today, that she was better qualified than Leone for the position.[88] On cross-examination Murphy testified:

Q. ... It was your statement to us today that you feel as of May 1978, with the background you have delineated and recited in your case, as opposed to the background concerning which you admitted knowledge in the case of Mr. Leone, that you felt more qualified for the position of director of personnel than Mr. Leone, is that not correct?

A. That is correct. . . .

Q. If someone were to tell you, Mrs. Murphy, that they reached the opposite conclusion, that is, that Mr. Leone was more qualified than you as of May '78 for this position, would you consider that irrational judgment?

A. No.

Q. Just a mistake?

A. No, I wouldn't say it was a mistake either. I would say it was subjective.

Q. So a reasonable person or a rational person could reach a different subjective judgment, is that not correct?

79. T.T. 814–15; Defendants' Exhs. 47; 52; 61; 64.

80. T.T. 809–11. *See* Plaintiff's Exh. 83.

81. T.T. 811–13; 826–27; Defendants' Exh. 117.

82. T.T. 809–10; Defendants' Exhs. 112, 113, 114, 115.

83. T.T. 813–14.

84. T.T. 815–16; Defendants' Exhs. 81; 98.

85. Defendants' Exhs. 75; 100; Court's Exh. 1, par. 72.

86. *See, e. g.,* Defendants' Exhs. 56, 57, 58, 76, 80, 83.

87. T.T. 135–36.

88. T.T. 134–35.

**A. Yes.**[89]

This assertion must nevertheless be tempered by the following stipulation concerning her qualifications for the director of personnel position:[90] "When she applied for the position of Personnel director, Ms. Murphy had no experience in: (a) screening, interviewing or recommending candidates for teacher appointments; (b) labor negotiations; (c) labor contract administration; (d) scheduling teachers; (e) school district or department budgeting."

\* \* \* \*

■ In this employment discrimination suit efficiency demands that we resolve *in limine* plaintiff's Title VII disparate treatment claims.[91] Plaintiff argues and we agree that caselaw to date makes clear that a plaintiff who fails to sustain her burden on a Title VII claim necessarily fails to sustain the burden of her § 1981 claim (42 U.S.C. § 1981) as well as her § 1983 claim based on equal protection (42 U.S.C. § 1983).[92] *Knight v. Nassau City Civil Service Comm.*, 649 F.2d 157, 161–62 (2d Cir. 1981); *Hudson v. I.B.M.*, 620 F.2d 351, 354 (2d Cir. 1980); *Huntley v. Community School Bd. of Brooklyn*, 543 F.2d 979, 983 nn. 5, 6 (2d Cir. 1976). Disparate treatment occurs where "... [t]he employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *International Brotherhood of Teamsters, supra*, 431 U.S. at 336 n.15, 97 S.Ct. at 1854 n. 15; *Grant v. Bethlehem Steel Corp.*, 635 F.2d 1007, 1013–14 (2d Cir. 1980). The burdens of production and proof in a disparate treatment case

have been clearly defined by the many cases interpreting Title VII coupled with the landmark decision of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1972) (*McDonnell Douglas*). Plaintiff has the initial burden of showing "(i) that [s]he belongs to a racial minority; (ii) that [s]he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite [her] qualifications [s]he was rejected; and (iv) that after [her] rejection the position remained open and the employer continued to seek applicants from person's of complainant's qualifications." *McDonnell Douglas, supra*, 411 U.S. at 802, 93 S.Ct. at 1824.

■ This rather flexible, non-onerous but mandatory prima facie showing "... is not the equivalent of a factual finding of discrimination..." *Furnco Construction Co. v. Waters*, 438 U.S. 567, 579, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978); it is largely a means of eliminating "... the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought." *International Brotherhood of Teamsters, supra*, 431 U.S. at 538 n.44, 97 S.Ct. at 1866 n.44. *See also Stanojev v. Ebasco Services, Inc.*, 643 F.2d 914, 919–20 (2d Cir. 1981). Of course, any showing of a "relative lack of qualification" by this defendant necessarily requires more in depth analysis by the trier of fact in light of the totality of plaintiff's ultimate burden of proof, because this argument does not preclude a plaintiff from being within the broad classification of qualified people for a particular job. However, it is clear that an

---

**89.** T.T. 134–36.

**90.** Court's Exh. 1, par. 71.

**91.** Plaintiff argues that this may be a pattern and practice case. We disagree. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336 n.16, 97 S.Ct. 1843, 1855 n. 16, 52 L.Ed.2d 396 (1977); *Ste. Marie v. Eastern R. Assoc.*, 650 F.2d 395, 405–06 (2d Cir. 1981). If plaintiff only intends that the cumulative impact of the three (3) decisions here, combined with the totality of the surrounding circum-

stance and statistics, spells out discrimination, we are not diverted from our conclusion. See *infra.*

**92.** Because plaintiff premised her § 1983 claim in part on the 14th Amendment, we are compelled to note that she has not adduced proof nor made any argument regarding the potential due process claim inherent therein. Therefore we cannot and will not consider this aspect of her claim.

absolute lack of qualification or a lack of vacancy in the job sought, without more, precludes plaintiff from proving a prima facie case under *McDonnell Douglas.*

■ In the case at bar we believe Murphy has failed to make out the imperative of a prima facie showing. Murphy did prove that on the basis of her race and/or sex she is a member of a minority group; that in 1978 she applied for the vacant position of personnel director; and that she was rejected in lieu of defendants' final choice, Domenic Leone. However, we believe that Murphy has not shown that she was even minimally qualified for the position of personnel director. The parties have stipulated the duties of the personnel director (*supra*) as well as Murphy's experience in some of those areas. Those responsibilities and her deficiencies therein, as well as Murphy's prior experience in each, are worthy of repetition: (1) interviewing, screening and recommending applications (Murphy had no experience); (2) labor contract and negotiation administration (Murphy had no experience); (3) advising employees on deficiencies and their resolution (Murphy had only *de minimus* informal evaluation experience at this level); (4) maintaining staff records and supplying needed information for budget development (Murphy had no experience except her general business background and education may have qualified her for developing and maintaining staff records); (5) analyzing personnel problems and developing policies concerning the same (Murphy had no direct experience, but did have tangential experience in her disciplinarian function analyzing student problems at Middletown); [93] and (6)

general responsibility over district-wide personnel, supervisory and evaluation programs (Murphy had at best *de minimus* experience in supervisory or evaluation processes at lower management levels).

Beyond that, the reality of the situation here was that the personnel director was (and is) intimately involved in, among other things, the accounting, allocation and negotiation of an almost $13,000,000 payroll budget. Murphy's striking lack of credible, tangible experience necessary to perform this function objectively establishes that the failure to promote her was positively in no wise based on race and/or sex. It was clearly a deficiency as one of the most important tools which the post entailed. In response to an inquiry addressed to her proficiency in the field of collective bargaining her response to say the least was inadequate.[94] Murphy's responses on cross-examination convincingly points this up as hereinabove quoted.

Clearly the foregoing proof in its totality is not of the type which dignifies the wisdom of *McDonnell Douglas'* (and its progeny's) teaching that in prima facie situations, *experience* demands that a mandatory presumption of discrimination arises because absent explanation a discriminatory animus is more likely than not. *E. g. Furnco, supra,* 438 U.S. at 579, 98 S.Ct. at 2950. Here, the explanation is abundantly clear.

Even assuming arguendo that plaintiff has sustained her initial burden, further analysis positively precludes us from finding any credible evidence of discrimination against her on the basis of race and/or sex. We turn then to defendants' burden.

---

**93.** Defendants' may have been influenced to some extent by Murphy's inability to comply with, and disregard of, Palgutta's "sign-in" policy.

**94.** Q. Do you know what the subject matter of collective bargaining—did you know as of 1978—
A. Yes. . . .
Q. What was it? . . . .
A. Collective bargaining was that on one side of the coin we'll have managements. On the other side we'll have a union which represents its employees, and the two of them would have

to get together, to agree on something specifically before it was passed down to be law, in other words, into the contract.
Q. Is there a mandated agenda for these deliberations?
A. I don't quite understand what you are asking me.
Q. Are there things you can talk about in collective bargaining and other things which you cannot?
A. I don't exactly remember that.
T.T. 123–24.

The defendants have the burden " . . . to articulate some legitimate, nondiscriminatory reason for the employee's rejection . . ." *McDonnell Douglas, supra,* 411 U.S. at 802–03, 93 S.Ct. at 1824–25. Most recently, this burden has been interpreted: "[T]he employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus. First, . . . the defendant's explanation of its legitimate reasons must be clear and reasonably specific. Second, although the defendant does not bear a formal burden of persuasion, the defendant nevertheless retains an incentive to persuade the trier of fact that the employment decision was lawful." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 258, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981) (*Burdine*). *See also Furnco, supra,* 438 U.S. at 577, 98 S.Ct. at 2949; *Ste. Marie, supra,* 650 F.2d at 399.

The defendants need *not* prove by objective evidence that the person selected for the job was more qualified than plaintiff. "Rather the employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria." [95] *Burdine, supra,* 101 S.Ct. at 1096.

For their part, the defendants have saturated the record with proof regarding their decision not to promote plaintiff to the position of personnel director. In its simplest terms, defendants maintain that their choice, Domenic Leone, was more qualified than plaintiff. Further, defendants emphasize that the entire procedure used to select "the best qualified" candidate was fair, neutral and in all respects a hallmark for other school districts to follow. We would be remiss if we failed to agree.

Bearing in mind that defendants need not prove that Leone was more qualified than plaintiff, we reiterate the essence of the articulated factors which defendants introduced at trial. Academically, Leone at that time was a dissertation away from a Ph.D. in educational administration (Murphy had a master's degree). Experience wise, Leone for the preceding seven (7) years held the *district-wide* position of coordinator of music. Pursuant to that obligation, Leone developed extensive music curricula for students from kindergarten through the 12th grade (Murphy could not produce any curricula she had developed). He had tangible negotiating experience as a co-chairman of the teachers' salary committee as well as being a member of the administrators' association negotiating committee; he was intimately involved in evaluation of and recommendation of tenure for teachers in his department (Murphy had no experience in either area). All in all, the picture presented by this individual was in our estimate one of solid experience and persuasively impressive credentials. Of course, we will not hold that this or any other candidate for the position of personnel director was absolutely "perfect" in every single respect.[96] That is unnecessary. Certainly, defendants here have convincingly articulated by way of admissible evidence that illegal, discriminatory motives did not form any basis for their decisions.

Further, the procedure employed for the selection of personnel director does not in any way (sub silentio or otherwise) indicate that Murphy was illegally discriminated against. Subsequent to advertisement[97]

---

**95.** Title VII was never intended to create a preference by employers for minorities. Rather it forcefully and effectively precludes the use of illegal, discriminatory criteria and practices by an employer.

**96.** Any argument that applicants other than the one selected were more qualified than Leone and as such forces an inference of discrimination against this plaintiff is unconvincing. We do not say that in all situations this type of evidence may not be helpful. However, here,

Murphy would have us infer from what is tantamount to silence in the record. Her own evaluation of comparative credentials only indicates that defendants exercised their unfettered right to choose among qualified candidates.

**97.** The fact there is no evidence that the advertisement announcing this vacancy appeared in any newspaper is not the slightest bit helpful to Murphy because she was in fact interviewed for this position. Nor does this lack of publici-

and initial "paper" screening of the numerous applicants, eleven (11) candidates (including Murphy) were interviewed for the position. Mr. Quick, a member of the screening committee, was not present for Murphy's interview. We attribute no significance whatever to this and only regard it as evidence of the reality of life. Title VII has never demanded that a screening system be flawless. Furthermore, neither party has attributed any significance to this fact and none of the screening committee members, it must be emphasized, selected Murphy as a finalist.

At trial, Murphy's testimony regarding this interview was vague and unconvincing. She barely remembered any of the general topics covered by the committee's interview and pointed to absolutely nothing tangible (by way of inference or otherwise) which even indicates (let alone prove) that defendants employed illegal promotion criteria.

Following these interviews and after independent selection by the committee members the three finalists (including Susan Schwartz) [98] were interviewed by the board of education; and Leone was selected by secret ballot. Again, a thorough and meticulous search of the entire trial record relating to this position definitely precludes our finding any untoward, much less discriminatory, proof.

■ Once the defendant has gone forward with its burden of production, plaintiff "... must be afforded a fair opportunity to show [the] ... stated reason ... was in fact pretext ...." *McDonnell Douglas, supra*, 411 U.S. at 805, 93 S.Ct. at 1825. More precisely, "plaintiff then has the op-

portunity to demonstrate that the proffered reason was not the true reason for the employment decision ... either directly by persuading the court that a discriminatory reason more likely motivated the employer or by showing that the employer's proffered explanation is unworthy of credence." *Burdine, supra*, 101 S.Ct. at 1096; *See also Grant, supra*, 635 F.2d at 161. Plaintiff's burden here simply merges into the ultimate burden of proving by a fair preponderance of the credible evidence that she was a "victim" of the prohibitions of Title VII. In other words, but for defendants' discrimination, plaintiff would have been promoted.

In her attempt to convince us that she was discriminated against on the basis of race and/or sex and to prove defendants' articulated reasons are pretextual, plaintiff points to certain statistics.[99] It is clear that these statistics are probative only as a means of bolstering plaintiff's disparate treatment claims and not as a prima facie showing here. *Hudson, supra*, 620 F.2d at 355.[100]

"Statistics ... come in an infinite variety ... and as such their usefulness depends on all the surrounding facts and circumstances." *International Brotherhood of Teamsters, supra*, 431 U.S. at 340, 97 S.Ct. at 1856. In this factual context, any statistical comparison of the percentages of black and other minority teachers (as opposed to administrators) to the percentages of black and other minority students "... fundamentally misconceive[s] the role of statistics in employment discrimination cases." *Hazelwood, supra*, 433 U.S. at 308, 97 S.Ct. at 2741.[101] We further note that plaintiff has

ty add in any way to the totality of the picture presented here.

**98.** The fact that Ms. Schwartz was a finalist tends to indicate that defendants *at least* up to that point in the screening process did not discriminate on the basis of sex.

**99.** See notes 45, 48, 50 *supra*.

**100.** This conclusion may now be different. See *Stanojev, supra*, 643 F.2d at 920–21. However, we need not resolve this issue as the proffered statistics by their own terms preclude any cred-

ible showing (much less inference) of discrimination.

**101.** Even if we were to attempt to compare the 1978–79 statistics regarding teachers (*see* note 50, *supra*) to the total labor force in Orange County or the school administrative work force in New York (*see* note 45, *supra*), we are stymied. The statistics regarding teachers may or may not include administrative positions. Clearly then, because of the general nature of these statistics, no meaningful comparison can be made.

broken down 1978–79 teacher statistics (for the high school *only*) by male and female teachers (*see* note 50, *supra*). Without an appropriate and meaningful comparison, this aspect of the statistics becomes meaningless. Therefore, we are compelled to disregard, and we will not consider, these figures.

Additionally, as here "[w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." *Hazelwood, supra*, 433 U.S. at 308 n.13, 97 S.Ct. at 2741 n.13. Despite this, the only other statistical comparison plaintiff offers is for the 1978–79 school year: 13.6% of defendants' school administrators were black when 5.5% of the *total* labor force in Orange County and 4.7% of the available school administrative work force in *New York* were black. This naked offer of proof [102] without more is no evidence of discrimination. In fact, taken literally, these figures strongly indicate that defendants at that time approached being exemplars in the field of minority hiring for positions as school administrators.

As heretofore repeated, plaintiff's insistence that she was more qualified than Leone is empty in light of the fair preponderance of the credible evidence adduced at trial.

We are well aware that it is imperative we be most sensitive in our analysis of plaintiff's proof regarding pretext. In this regard our burden is lightened, for we are confronted with a trial record barren of proof beyond plaintiff's own conjecture and misgivings—no credible proof or argument of pretext exists in the totality of this trial record.[103]

At trial, plaintiff tried to establish the fact that other applicants, besides Murphy,

were more qualified than Leone; specifically Palgutta, Susan Schwartz and Robert Minor (*see, e.g.,* T.T. 705–09). Murphy argues in her post trial brief that such evidence negates defendants' assertion that Leone was best qualified. This, plaintiff suggests, establishes that defendants used subjective criteria in judging the candidates and merit was not the overriding criterion.[104]

We are not prepared to draw the inference plaintiff suggests. First, we certainly are not convinced that the other candidates plaintiff mentions were more qualified than Leone. Second, judging the relative qualifications of the candidates *vis a vis* each other strays from the relevant analysis in this disparate treatment case: Was plaintiff denied this promotion for legitimate or non-legitimate discriminatory reasons under Title VII. Third, even assuming arguendo that this does suggest only that a more careful scrutiny of the selection procedure employed is appropriate, standing alone it simply does not create an inference of discrimination against this plaintiff. Further, our review of the selection procedure has produced no proof of discrimination.

We are unable to conclude based on the totality of the proof adduced that defendants' proffered reasons are a pretext and tantamount to a finding by inference of discrimination. Discriminatory motive is critical, if not the *sine qua non*, in a disparate treatment case. Plaintiff has simply failed to sustain her ultimate burden and defendants clearly have shown that absolutely nothing was done which Title VII prohibits.

d. 1978 assistant principal position

■ In August, 1978 an assistant principal position at the high school became vacant due to the resignation of Steven Fink-

---

**102.** Plaintiff has adduced no proof regarding the standard deviation of these statistics nor any expert testimony to enhance the probative value thereof.

**103.** We note that plaintiff's argument of an "old boy network" combined with allegations

of "country club associations" between and among some defendants and Leone as well as Ziter has no place here and carries no weight whatever.

**104.** Plaintiff's Post Trial Brief, pp. 66–68; *See also* Plaintiff's Post Trial Reply Brief, p.29.

elstein.[105] The district then undertook efforts to find a replacement.

In 1974 the school board had adopted a statement of policy for the selection and recruitment of personnel for positions such as assistant principal.[106] It stated that the only criteria to be used for an appointment must be "merit and likelihood of success in the position." This statement also outlined the procedure to be employed: (1) every formally interviewed candidate shall be evaluated by a minimum of two professional staff members; (2) to promote consistency an "interview guide" should be prepared to serve as a basis for all interviews; and (3) adequate documentation to support the ultimate selection should be available including college transcripts, recommendations, references, and written evaluations based on the personal interviews. According to this policy statement, the superintendent of schools was responsible for recommending candidates to the board of education (who in turn would be responsible for formal approval). Further, that the superintendent could delegate to other administrators the responsibilities of screening, interviewing and recommending candidates. Palgutta testified that the procedure developed and ultimately used to select the new assistant principal was based upon the board's expressed policy.[107]

The district advertised in *The New York Times* for a new assistant principal, sent notices to several college placement officers, and posted notices in the district. As a result, 103 applications were received including Murphy's.[108]

Once the applications were received, the first step in the selection process was to screen them. That function was undertaken by Leone, then the personnel director, and Michael Edwards, the vice-principal of the high school. Palgutta testified that he had informed both as to the qualifications he was looking for in an assistant principal: that he wanted someone with experience in supervision, discipline, curriculum development, hiring of teachers, and the budgetary process.[109] Leone and Edwards reviewed the 103 applications selecting fifteen candidates for further consideration. All district employees, including Murphy, who applied for the position and possessed the requisite degree and certification were included in this group.[110]

These fifteen candidates were then personally interviewed by Palgutta and Edwards. Palgutta testified that before the interview took place, he and Edwards met to discuss the procedure which would be used; and that nine questions were prepared to be asked of each of the candidates.[111] These questions dealt with subjects ranging from the candidates' curriculum experience, community activities, and scheduling experience to a "role playing" type of question relating to how a teacher would react to a student who used profane language.[112]

Murphy was interviewed for the position by Palgutta and Edwards together, as were all of those interviewed.[113] Murphy testified that she considered the interview only a formality because the assistant principal position was advertised as being predominantly disciplinary work and Palgutta above anyone else knew what she had done in discipline for five years.[114] She further testified that at the interview she was

---

**105.** Court's Exh. 1, par. 78.

**106.** T.T. 1096–97; Plaintiff's Exh. 93. We note that Murphy has attributed no significance to the district's failure to use this policy in selecting the personnel director.

**107.** T.T. 1096–97; Plaintiff's Exh. 93.

**108.** Plaintiff's Exhs. 57; 58; Court's Exh. 1, pars. 78, 79, 80. 21 of the 103 applicants were female, comprising 20% of the total. Court's Exh. 1, par. 85.

**109.** T.T. 1100–01.

**110.** Court's Exh. 1, pars. 81; 84. There were six in-district candidates in the group of fifteen. Four of the fifteen candidates were women. Court's Exh. 1, par. 85.

**111.** T.T. 1107–08.

**112.** Defendants' Exh. 241.

**113.** T.T. 72.

**114.** T.T. 154.

asked only four questions, all by Palgutta. The questions Murphy stated were asked of her concerned: (1) how she would react to having an idea of hers rejected by the principal; (2) reaction to a strong "anti-cutting" policy; (3) her participation in and supervision of extra-curricular activities; and (4) what could she contribute to the school. Further, she testified that she was not asked a question concerning curriculum and her work in curriculum was not discussed.[115]

Palgutta testified that he felt "confident" that Murphy was asked all of the nine questions and that an answer was received to each; but as to what Murphy's replies were, Palgutta could not recall. He did however characterize her interview as "poor"; that Murphy frequently replied to questions with the assertion that her work as a teacher, disciplinarian and counselor was well known; and that her answers in response to questions dealing with her experience in curriculum, evaluation, and supervision were vague.[116] On cross-examination Palgutta testified that not all nine questions were asked of each of the candidates and perhaps Murphy was not asked all nine either; but that in the course of her interview, Murphy discussed the subject matter of each of the nine questions.[117] Further, Murphy was concededly asked one open-ended question aimed at allowing the interviewee to expound upon her experiences and contributions to the school.[118]

Palgutta testified that usually at the end of each day of interviewing he and Edwards would separately fill out evaluation forms for each of the candidates interviewed; and that the relative merits of the candidates were not discussed until all the interviews and evaluations were completed.[119]

The evaluation forms used in connection with the interviews were broken down into nine categories ranging from "teaching skill" to "appearance." Within each category the interviewer would assign a score of one (lowest) to five (highest).[120] Murphy's evaluation forms, one completed by Palgutta and another by Edwards, reveal that Murphy received "4"s and "5"s in all of the categories for which she was evaluated. In comparison to the evaluations of other candidates Murphy's was not the highest or lowest.[121]

The next step in the selection process was for Palgutta and Edwards to independently evaluate the "net worth" of each of the candidates and rank them accordingly.[122] Both met afterwards to compare their respective rankings and two things became readily apparent. First, on each of their lists of fifteen the first seven ranked candidates were the same. Second, according to Palgutta, there was a "definite break" between the seventh and eighth candidate on each of the lists and that he and Edwards decided that the bottom eight candidates would no longer be considered. Murphy was one of the bottom eight candidates.[123]

Palgutta and Edwards then discussed the relative qualifications of the remaining seven applicants; first eliminating from further consideration the bottom two candidates; and ultimately narrowing the field down to two candidates: Donald Ziter, the chairman of the high school mathematics department, and Kenneth Gray, a junior high school teacher.[124]

Shortly thereafter (perhaps the next day according to Palgutta) Ziter and Gray were again interviewed by Palgutta and Edwards. Palgutta testified that basically the

115. T.T. 1396–97.

116. T.T. 1116–17.

117. T.T. 1209–11.

118. Court's Exh. 1, par. 87.

119. T.T. 1219–21.

120. *See, e. g.*, Plaintiff's Exh. 60.

121. *Compare* Plaintiff's Exhs. 60, 61 *with* Defendants' Exhs. 115(a)-(h).

122. T.T. 1239; Court's Exh. 1, par. 88.

123. T.T. 1117–19; Court's Exh. 1, pars. 88, 89. One of the seven remaining candidates was a woman. Court's Exh. 1, par. 88.

124. Court's Exh. 1, par. 89.

same subject areas were discussed and that at the end of these second interviews he decided that Ziter was the stronger candidate.[125] Palgutta testified that he discussed his feelings with Edwards and that Edwards expressed some favorable points about Gray because Gray came from the junior high and appointing him might have helped the unification of the two faculties.[126]

Ziter was interviewed a third time and Palgutta then recommended Ziter for the position to Krause.[127] Krause testified that once Palgutta made his choice known, he questioned Palgutta on the procedure used to assure himself that everyone had been given an equal opportunity.[128] Having satisfied himself, Krause planned to recommend Ziter to the board of education at their next regularly scheduled meeting. However, at that meeting a representative of the NAACP asked that the appointment be postponed because of charges brought by Murphy that she had been discriminated against.[129] Murphy had filed a complaint with the Orange County Human Rights Commission and subsequently filed charges with the New York State Division of Human Rights alleging that she was denied both the personnel director and assistant principal positions because of race and/or sex discrimination.[130]

Anthony Muratore, a commissioner on the Orange County Human Rights Commission in 1978, testified that once Murphy's complaint was received he was assigned to the case and undertook an investigation. Muratore stated that in the process of this investigation he spoke to several faculty members of the high school and several present and past students of the school. It was Muratore's belief that there was a "possibility" that there was a violation of the state's human rights laws.[131]

Krause testified that after the board meeting during which Ziter's appointment was postponed, he met with Muratore, Mr. Horton, chairman of the Orange County Human Rights Commission, William Bennett, education committee chairperson for the NAACP, Louis Ellison, president of the board of education, and George Sands, the personnel committee chairperson of the school board. At this meeting the selection procedure was discussed and the district representatives attempted to show that everyone, including Murphy, was given a fair and full opportunity.[132]

Krause further testified that he met with a senior field representative of the state human rights commission, Charlotte Bordwell, and she reviewed the district's procedure and documents concerning the candidates.[133] In her report concerning Murphy's charges, Bordwell stated: (1) even though there was a "disproportionally small" number of women in administrative positions (approximately 18%) a larger number of women were interviewed for the position (25%) than applied; (2) the student enrollment was 9.9% black, black representation in professional positions was 5.6%, but that the number of black administrators was over 18%; (3) most of the applicants interviewed were "at least as well or better qualified" (on objective grounds) than Ziter as he was the only candidate without an advanced degree. She further stated in this report that the final choice was "apparently" made on the basis of "subjective administrative judgment" which was not reviewable by the agency. Her conclusion was that the evidence did not sustain Murphy's charge that she was a victim of race and/or sex discrimination.[134] On March 21, 1979 the regional director of

---

125. T.T. 1123; Court's Exh. 1, par. 90.

126. Id.

127. T.T. 1127; Court's Exh. 1, par. 90.

128. T.T. 621.

129. T.T. 622–23.

130. Court's Exh. 1, par. 1; See T.T. 474–76.

131. T.T. 474–76; 507–09.

132. T.T. 624–26.

133. Id.

134. Plaintiff's Exh. 120.

the state division of human rights dismissed Murphy's complaint and ordered the file closed.[135]

Ziter, who had been appointed to the assistant principal post on an interim basis while Murphy's charges were investigated, was appointed on a permanent basis at the board meeting of October 5, 1978.[136]

The functions and duties of the position for which Ziter was chosen were predominantly discipline related.[137] Even though the extent to which the assistant principal would be involved in discipline is unclear from the trial record, it was not the sole function of the position.[138] Anthony Capozella (Capozella) called by the plaintiff, assistant to the principal under Courtney's tenure and assistant principal once Palgutta became principal, testified that as assistant to the principal his primary duties revolved around discipline and attendance work; that under Palgutta his duties changed. Capozella stated that in his new role, he observed and made formal evaluations of teachers, screened prospective applicants for teaching positions, and assigned teachers to various supervisory duties. Capozella also testified that he was assigned by Palgutta to supervise extra-curricular activities and events where his attendance was required.[139] However, Murphy testified that she had worked with Capozella for five years when he was assistant to the principal and his duties then were predominantly discipline related; and that when he became assistant principal his major function was still discipline. Murphy further testified that she viewed the assistant principal position the equivalent of the post she held when she exercised disciplinary duties from 1971 to 1976.[140]

Palgutta testified that the assistant principal was now involved with the preparation of the annual master schedule, curriculum development, the hiring of personnel and the budgetary process; that once two assistant principal positions were created, Capozella had reduced disciplinary duties as compared to his previous role. Palgutta viewed the assistant principal of his school as "...an administrator who covers the entire spectrum of administrative services and he does that with direct order and responsibilities." [141]

Even though Murphy apparently did not recognize the change in the role of the assistant principal and the added responsibilities, evidence was adduced as to the new functions of the position. Aiding in the preparation of the annual master schedule was one of the new responsibilities. Palgutta testified that it involved the cooperation of department heads, the vice-principal and the two assistant principals; that the process initially involved the matching of teachers' skills with the contents of courses, necessitating evaluation of teachers' capabilities as well as preferences. Second, once these factors are taken into account, a preliminary schedule was arrived at, conflicts in courses were resolved, and room utilization evaluated, before the final schedule was determined. The process usually ended in April preceding the school year for which it was to be used.[142]

Murphy articulated her understanding of this scheduling process:

> ...Once you get that, the number of teachers, then the number of students that is taking the specific subject, you divide that up among the teachers you

---

**135.** Plaintiff's Exh. 121. Murphy had also filed charges with the E.E.O.C. Likewise, the charges were dismissed by this agency. Court's Exh. 1, par. 1.

**136.** Defendants' Exh. 175.

**137.** T.T. 307–08, 1230–31.

**138.** Anthony Capozella, an assistant principal under Palgutta put the figure at approximately 80–90%. T.T. 345–46. Palgutta testified that discipline was approximately 70% of the assistant principal's job functions. T.T. 1233–34.

Donald Ziter, another assistant principal at the high school testified that discipline took up approximately 60% of his time. T.T. 1390–91.

**139.** T.T. 315; 333–34.

**140.** T.T. 151–53.

**141.** T.T. 1187–89.

**142.** T.T. 1061–65.

have teaching it, and what periods they have available, and you mesmerize this along with the rest of the students' schedule into an ample time slot whereby each student has a proper schedule and a given lunch period.[143]

Another responsibility of the assistant principal was curriculum development. Palgutta testified that with the passage of time and new developments in such fields as "math and science" it became necessary, almost annually, to revise the subject matter of a course.[144] Murphy testified that she had experience in curriculum development; that she had prepared a written curriculum for a non-Regents English course at the request of Courtney; and that her work-product was being used today in a 10th grade non-Regents English class.[145] On cross-examination Murphy testified that she had typed this curriculum work on two or three yellow sheets of paper, and the last time she saw it was when it was given to Courtney.[146] However, Courtney could not specifically recall whether Murphy was involved with curriculum development. Further, Palgutta testified that he was in charge of curriculum development under Courtney and had no recollection of Murphy being involved in the process.[147]

Nancy Prather, a witness called by the plaintiff, and an English teacher for the district for the past eighteen years, testified that Murphy had been involved in curriculum development.[148]

Murphy's experiences in life were not limited to her work at the school or her previous periods of employment. She testified that she was involved in community affairs, specifically with the local chapter of the NAACP, of which her husband was president. She stated that besides assisting her husband she was involved with the Regional Economic Community Action Program, "RECAP", where she would tutor children; teach parents "survival skills" (many of them were illiterate); and help families deal with various social service agencies. This work, coupled with her duties at the district, consumed so much of her time at home that Murphy testified she had to get an unlisted telephone number.[149]

The record reveals that Murphy is well respected for her teaching and disciplinary work having received praise from her superiors, contemporaries, students and parents.[150] She performed her disciplinary duties well, perhaps in an exemplary fashion; and there is no evidence in the record that she was less effective as a teacher.[151] However, in essence Murphy's experience in the field of public education consists of classroom teaching of English, typing, use of business machines, and the handling of disciplinary related problems with female students.[152] Her work experience outside of the academic environment consists of secretarial work for several companies and employment as a caseworker for a year and a half. Additionally, we note that Murphy has done other volunteer work in her community.

Donald Ziter served as the chairman of the high school mathematics department for the two years immediately preceding his appointment as assistant principal. He was first hired by the district as a mathematics teacher in September, 1967.[153] As department chairman, Ziter's duties included: (1)

143. T.T. 214.

144. T.T. 1057–61.

145. T.T. 20; 63.

146. T.T. 210.

147. T.T. 1058; Plaintiff's Exh. 127, p. 127.

148. T.T. 438. Murphy's qualification and experience for the other responsibilities of the assistant principal, specifically knowledge and experience in the hiring of personnel and the budgetary process, have been discussed already in the context of the personnel director's position. (*supra*).

149. T.T. 26–28.

150. *See* T.T. 357–59; 432–35; 472; Plaintiff's Exhs. 1, 2, 119; 127, pp. 20–21.

151. T.T. 309, 1225.

152. Court's Exh. 1, par. 58.

153. T.T. 1355; Court's Exh. 1, pars. 93, 94.

observing and evaluating teachers' class-room skills and performance; (2) preparing reports on teachers for their official person-nel file; and (3) providing leadership in curriculum development efforts and in eval-uating and selecting textbooks.[154]

Ziter testified that as department chair-man he was responsible for twenty to twen-ty-four evaluations a year, of which some were reports on the same teacher. As to curriculum experience, Ziter testified that when he was in the mathematics depart-ment he recognized that the program of instruction was deficient in that there was only a general course of study; that he, along with others, developed a four tiered program so that students could be placed in appropriate levels of mathematics instruc-tion. Ziter further testified that the state subsequently developed a program of in-struction which was very similar to the one he had developed and is now being used in the district.[155]

Aside from his duties as department chairman and teacher, Ziter also served as principal of the high school for the summer programs in 1970, 1971, 1974 and 1975.[156] He testified that when he first started teaching at the district, there was no sum-mer program and he felt that a "positive" approach was needed to help students who failed courses. Ziter asserted that through his initiative the summer program was reinstituted.[157]

During the regular academic school years, Ziter performed various administrative functions. He served administrative in-ternships as the high school guidance de-partment chairman and during the 1973–74 school year served as assistant principal. Ziter has also served as director of the high school equivalency program from 1974 to the present day.[158]

The record also reveals that Ziter was actively involved in the non-academic side of school life. He served as coach for sever-al interscholastic sports teams and was a class and student council advisor.[159]

Ziter received a bachelor of science de-gree from the Massachusetts State College at North Adams.[160] He had taken graduate courses at Bennington College, New York University and the State University of New York at New Paltz. However, Ziter did not have his masters degree when he was ap-pointed as assistant principal.[161] He did however have certification from the state as a school administrator and supervisor.[162]

* * * *

No purpose would be served by repeating the precedents heretofore stated (see "c.", supra). Accordingly, we turn to our analy-sis in light of these principles already enun-ciated.

Murphy argues and we agree that she has made out her prima facie showing for the 1978 assistant principalship. Murphy, by reason of her race and/or sex has shown that she is within the class protected by Title VII; that by education and experience she was to some extent qualified for the position of assistant principal for which the district was seeking applicants in 1978[163]; that despite this, she was rejected in lieu of the district's ultimate 1978 choice, Donald Ziter.

154. Court's Exh. 1, par. 95.

155. T.T. 1367–69; 1386–87.

156. Court's Exh. 1, par. 96.

157. T.T. 1364–65.

158. Court's Exh. 1, pars. 97; 98.

159. Court's Exh. 1, par. 100.

160. Defendants' Exh. 121. The college tran-script reveals that this degree was granted in June, 1962, but counsel have stipulated that it was granted in 1961. See Court's Exh. 1, para. 91.

161. T.T. 1249–50; Plaintiff's Exh. 114(L).

162. Court's Exh. 1, par. 92.

163. By concluding that Murphy was qualified for this position, we do not hold that she was qualified for each aspect of the position's duties. Rather that on the basis of the credible proof adduced she has convinced us by a fair preponderance that she is among a general group who by education and experience could perform this function.

At least one-half of the function of the assistant principal was discipline related in 1978. Murphy had spent two-thirds of her time from 1971–76 dealing with this subject matter for female students.[164] That alone generally might qualify her for this position. However, discipline was not the sole function of an assistant principal in 1978. Other new functions (since Palgutta became principal in 1976) included observing and evaluating teachers, screening of teacher applicants, supervising extra-curricular activities, preparing a master schedule and in a general way being involved in the budgetary process. We need not reiterate Murphy's *de minimis* (and in some areas non-existent) experience in these vital functions; we are compelled to note that Murphy has simply failed to accept this change in duties. Murphy argues at length (both here and for the 1979 assistant principalship) that the job of assistant principal was the same as her job as a disciplinarian from 1971–76; and therefore, she was best qualified for either position. Even at this early stage in the *McDonnell Douglas* analysis, this argument simply fails to recognize the reality of a change in the position and falls flat in light of the overwhelming, credible evidence adduced as heretofore stated and repeatedly emphasized. However, while it is clear that Murphy was not "the perfect" candidate for this position, we are unwilling to find that she was not qualified for that post.

For their part, defendants insist that Donald Ziter was the best overall choice for the post; that the selection process was fair and neutral in all respects; and that in no wise did race and/or sex form a basis for their decision not to promote Murphy.

As the credible proof adduced clearly shows, Ziter was intimately involved in the day-to-day workings of the high school. He served as chairman of the "math" department which provided him with tangible, usable experience for the assistant principal's position. Ziter was summer school principal for four (4) separate summers. His involvement in extra as well as co-curricular activities was in our estimate laudatory. Further, his creativity and initiative were eminently displayed by the summer school and "math" programs he reinstituted and developed.

Murphy argues that because Ziter did *not* have a master's degree at the time of his appointment (and Murphy did) and because she was not given credit for her community activities, the Ziter choice is tantamount to de facto discrimination. We disagree. It is too late in the day to advance the argument that education alone makes one person more qualified than another. Of equal, if not superior, importance is what the human being brings to the post—his experiences in life, his *manifest* attitude towards his work, his creativity and ability to deal on a day-to-day basis with administrative as well as student problems which may arise. Further, we find absolutely nothing in the record which in any way indicates that Murphy was not given credit for her community activities. The district however may have been unimpressed, among other things, with Murphy's striking lack of extra or co-curricular experience.[165]

As to the selection process itself, we are again left with a total trial record which defies a finding of anything discriminatory about its application. The actual procedure adopted was pursuant to the district's previously written policy. After advertising and initial screening, fifteen candidates (including all in-district applicants) were interviewed by Palgutta and Edwards.[166] The

---

**164.** No argument was advanced regarding the change, if any, in the needs of a disciplinarian at the high school since Murphy last performed that function, some two years before this vacancy occurred.

**165.** Certainly an employer in the Title VII context need not consider experience it deems unhelpful to a candidate's overall ability to handle a particular job for which the employer seeks applicants, provided that a determination that particular experience is not of significant value for the task to be performed does not form the basis of a pretextual denial of a promotion or hiring.

**166.** Murphy argues that because she was not asked the nine questions that all others interviewed were, the process operated to discriminate against her. However, the record indi-

written evaluations of Murphy's interview introduced at trial combined with the credible testimony of Palgutta (one of the interviewers) indicates only that Murphy gave a less than adequate and impressive accounting of herself. Her answers to questions were vague in part and often were only that her prior work in discipline and teaching were known—on the whole, a poor response indeed to most pertinent questions asked of one seeking an outstanding promotion.

Subsequent to the interviews and acting independently, Palgutta and Edwards reduced the candidates to two (excluding Murphy from further consideration). These two were interviewed again and finally Ziter was recommended to Krause for the appointment. Krause testified that after all this had been done and before he recommended Ziter to the board of education, he discussed the procedure used at length with Palgutta to satisfy himself that it was indeed fair. Having been satisfied, Krause recommended Ziter. Again, no evidence tantamount to a finding of discrimination exists.

Murphy attempts as she is entitled to under *McDonnell Douglas* to prove that the district's explanation and proffered reasons are not worthy of credence and in fact pretext. First, Murphy points to the determination of the New York State Division of Human Rights findings that the Ziter choice "...was apparently made on the basis of subjective administrative judgment..." and that other applicants were "...at least as well or better qualified (on objective grounds) than Ziter ...."[167] Murphy argues that this is direct evidence

that the district's proffered reasons are a pretext. We disagree.

■ Proof of discriminatory motive is critical to Murphy's case and this offer of proof is not of the type which the law mandates as necessary to fulfill that onerous burden. The "subjectivity" referred to in the Division of Human Rights' findings is precisely what *McDonnell Douglas* and its progeny teaches is to remain untouched by Title VII. We need not agree with the district's ultimate choice for this or any position. The district need not even convince us that their choice was the best.[168] Rather the district only has the incentive of ultimate victory to prove that its choice was the best. Further, the fact the State Division of Human Rights found that other applicants were at least or better qualified on objective grounds as Ziter is unpersuasive in light of their ultimate conclusion with respect to the Ziter position: That the division found "no probable cause" that race and/or sex formed a basis for the district's decision.[169] As with all of the other arguments advanced we are again left with nothing—beyond the mere words of the argument themselves—which in any way indicates (by inference or otherwise) that a concededly subjective choice was illegally made.

Murphy's other arguments of pretext are equally inapposite. She argues that because her interview was different from others, because Ziter did not have a masters degree, because she was not given credit for her community work, because the assistant principal position was the same as her former disciplinary job (making her the most

cates that not all interviewed were asked all nine questions; and in any event the reality here is that Murphy assumed that because of her prior discipline experience, this job was hers and that the interview was only a formality. Further, because Murphy was concededly asked an open-ended question at the interview, she had a clear opportunity to advance her credentials in any areas she perceived to be ignored by earlier questions. Court's Exh. 1, para. 87.

**167.** Plaintiff's Exhs. 120, 121.

**168.** Title VII cannot nor does not demand that an employer relinquish any of its rights to select what it believes to be competent, qualified employees provided illegal criteria do not become part of the process.

**169.** Nor does Murphy's argument that others were in fact more qualified than Ziter and thus evidence of discriminatory motive *against* her, persuade us from our conclusion. This one-sided argument again fails to consider the district's right to choose among qualified applicants.

qualified) combined with the Division of Human Rights' findings clearly and conclusively proves by a fair preponderance of believable proof that the district's proffered reasons are not worthy of credence.[170] Yet we can find nothing in the total trial record to support these spurious claims. Even in light of the totality of their cumulative impact on the district's articulated reasons, we are left with inconsequential strawmen—arguments which are lacking in substance and in no wise detract from the legitimate and lawful choice ultimately made.

e. 1979 assistant principal position

In 1979 another assistant principal position at the high school became vacant. Capozella, who had been employed by the district for twenty-seven years, announced his retirement in February to become effective June 30, 1979.[171]

The procedure the district employed to fill this vacancy was not the same used when selecting Ziter for the same position in 1978. Krause testified that the district wanted to make more certain that no one in the future could say or suspect that discrimination would play any part in the process and therefore a "broader-based participatory" procedure was devised.[172] According to Krause, he, Trachtenberg, and possibly George Sands, prepared a written outline of this new selection process.[173] It provided that notice of the vacancy was to be posted in the district and advertised widely; the high school principal and personnel director would screen all the applications selecting 10–15 candidates for interviews; and then a screening committee would interview these applicants and select 3 to 5 for further interviews. This screening committee was to be composed of seven (7) persons ranging from a representative of the Middletown Teachers Association to the director of personnel. The principal and vice-principal were then to interview the 3 to 5 candidates screened by the committee and recommended no more than 3 to the personnel committee of the board of education and superintendent of schools for their evaluation. The final step in the process was for the personnel committee and the superintendent to present their recommendation to the board of education.[174]

At the time the district undertook to find a replacement for Capozella, it also had an affirmative action program in effect. Leone, who admittedly drafted the document, testified that since the district had been accused of discrimination (creating a "tense" situation) the affirmative action committee had decided to act as a unified body and thus presented all of its policies without dissent.[175] The affirmative action plan itself provides for timetables and goals which sought to achieve "parity" between affected class members in the labor force and employment of that class within the district.[176] It also contained a plan for the recruitment of candidates, minority or otherwise. Leone testified that recruitment was the "heart of the plan"; that the goal was to make all those potentially qualified aware that an opening existed.[177] Further, the affirmative action plan clearly set forth the district's policy as to selection of personnel, the only criteria to be considered were merit and likelihood of success.[178] Leone, who was involved in various stages in the selection of the new assistant principal, testified that neither the screening committee

---

**170.** Any reference to the statistics offered at trial, as heretofore stated, is unconvincing and in fact reduces the credibility of plaintiff's own arguments.

**171.** T.T. 307; Court's Exh. 1, par. 103.

**172.** T.T. 757–58. This change was caused by Murphy's filing of charges against the district with the New York State Division of Human Rights and the E.E.O.C.

**173.** T.T. 760; Plaintiff's Exh. 92.

**174.** Plaintiff's Exh. 92.

**175.** T.T. 876.

**176.** Plaintiff's Exh. 66, pp. 17–26.

**177.** T.T. 863; See Plaintiff's Exh. 66, pp. 13–16.

**178.** Plaintiff's Exh. 66, p. 2.

discussed nor referred to the affirmative action plan when evaluating candidates.[179]

In accordance with the new, established procedure, the district advertised the opening for an assistant principal in *The New York Times*, posted notices in the district, and sent notices to placement officers of all colleges in the state which offered certification in the area of educational administration.[180] As a result of these efforts, 126 applications were received.[181] Palgutta and Leone then screened the candidates' submissions, selecting 19 for interviews. Murphy, along with all in-district applicants who possessed the requisite degree and certification were selected for interviews.[182]

The next step in the selection process was for the screening committee to interview the candidates. Even though the pre-established guidelines dictated that the screening committee consist of seven persons, only four members of the school community officially served on this committee. They were Mary Jane Elia, a guidance counselor at the high school, Frank Schuerholz, guidance coordinator for the district, Sybil Hammond, director of the prekindergarten program, and Domenic Leone.[183] Leone testified that other representatives from the school community were invited to serve, in accordance with the guidelines, but because of time constraints could not.[184] Seventeen candidates were eventually interviewed by this committee, including Murphy.[185]

Mary Jane Elia, a member of the screening committee, testified that questions were asked of Murphy and in her opinion Murphy responded well; that other members of the committee were not as impressed with Murphy. Elia stated that one person felt Murphy had not articulated well; another was of the opinion that Murphy had not performed her disciplinary duties well.[186]

Frank Schuerholz, who was also present for Murphy's interview, testified that Murphy was asked questions dealing with her philosophy of education and how she would handle a hypothetical disciplinary problem:[187] that Murphy had not handled the questions well; and that one interviewer, Sybil Hammond, was distraught by the manner Murphy answered the question concerning discipline. Schuerholz characteriz-

---

**179.** T.T. 855–56. Anthony Muratore, a member of the affirmative action committee, testified that he recommended that a black woman be appointed assistant principal at the high school and that this proposal was rejected in lieu of a proposal that a white woman be selected within the goal period because there was a much larger white female population qualified for the position. T.T. 489–91. Plaintiff's counsel argued at trial that the intent of the report was to hire a white woman at the administrative level and while women are a "protected class", white women are not. Thus the affirmative action plan was fostering improper selection goals. Plaintiff argues in her post trial memorandum that these events are "particularly significant." Plaintiff's Post Trial Memorandum, p. 77. We disagree. First, we find Muratore's testimony unconvincing in light of Leone's and Krause's clear assertions that the affirmative action plan was not considered in the 1979 selection process. Further, the document speaks for itself; the district was bound to select the most qualified candidate regardless of race and/or sex. Third, plaintiff has simply failed to show us the legal significance of an informal opinion of one member of this committee which apparently was not the consensus of the other members of the affirmative action committee.

**180.** Court's Exh. 1, par. 104.

**181.** Court's Exh. 1, par. 105. 106 of the applicants were men; 20 were female. *Id.*

**182.** Court's Exh. 1, par. 107. There were four in-district candidates within this group of 19. *Id.* 16% of the applicant pool were women and 26% of the candidates selected for interviewing were women. Court's Exh. 1, para. 117.

**183.** Court's Exh. 1, par. 109. Trachtenberg served as an unofficial member of the committee. *Id.*

**184.** T.T. 832–34. Apparently the committee met in May, towards the end of the school year. *Id.*

**185.** Court's Exh. 1, par. 108. Of the 17 candidates, ten were white males, two white females, one black male and two black females. *Id.*

**186.** T.T. 379–80.

**187.** T.T. 935–36.

ed the interview as "one of disappointment." [188]

Once all of the candidates were interviewed, discussions were had on the relative qualifications and performances of the applicants. The committee's task was to submit names of the top five candidates to Palgutta, and to this end each committee member ranked their top choices. Murphy was included by Elia on her list of the top seven candidates, but her name did not appear among the top candidates on the other interviewers' lists. [189] After further discussion and evaluation of the candidates, the committee agreed to recommend six candidates to Palgutta. Murphy was excluded from further consideration. [190]

Palgutta and Edwards then interviewed five of the committee's choices independently. [191] Palgutta testified that the candidates were asked the same type of questions which were used in the selection of the assistant principal of 1978; that they were not written down because he and Edwards were operating independently this time. Palgutta and Edwards then met to discuss the five candidates and three were subsequently selected to interview with the board of education. [192] The three selected, each of whom were not previously employed by the district, were: Mary Gisondi, a white female; James Taylor, a black male; and Constance Frazier, a black female. [193]

The three finalists then were interviewed by the board of education, Krause, Tra-chtenberg and Leone. [194] Questions were prepared ahead of time and used at each of the interviews. [195] After the completion of all three interviews, the candidates were discussed among those present. [196] Krause convincingly testified that in these discussions at no time was the race of the candidates mentioned, let alone discussed. [197] The board members along with Krause and Trachtenberg then voted for their respective choices by paper ballots. However, according to Krause, the results of the vote were either a tie or a "virtual tie" and no conclusion could be reached on the first ballot. To break this dead lock, an adjustment in the voting procedure was made; each person now marked their votes for their first, second and third choices (3 points for first choice, 2 points for second, etc.); and the person who received the highest aggregate score became the new assistant principal. After the ballot was completed and tabulated, Mary Gisondi received the appointment as assistant principal. [198]

At the time Gisondi was selected as assistant principal, the record reveals that the duties and functions of the position were still predominantly discipline related. There is no evidence that the assistant principal did not still have responsibility in other areas (as heretofore stated) such as curriculum development, scheduling, etc.

Immediately prior to her appointment to the assistant principalship, Gisondi was employed at the Goshen Central High School, located in New York, as an English and

188. T.T. 936; 942–43.

189. T.T. 386, 938–41; Court's Exh. 1, pars. 113, 114.

190. Court's Exh. 1, pars. 114, 115. Apparently the committee could not agree on only five candidates therefore a sixth was included. T.T. 939.

191. Court's Exh. 1, par. 116; T.T. 1153. One of the candidates withdrew from further consideration. *Id.*

192. T.T. 1153–55; Court's Exh. 1, par. 116.

193. Court's Exh. 1, par. 116.

194. T.T. 644; Court's Exh. 1, par. 118.

195. T.T. 646–47; Defendants' Exh. 246.

196. According to Krause, Palgutta and Leone were present at this meeting but since both had been involved in an earlier stage of the selection process and the board wanted an independent judgment made at this final step, neither participated in the discussions. Palgutta did however make a recommendation that James Taylor be appointed, but afterwards was excused from the meeting. T.T. 653–54.

197. T.T. 661–63.

198. T.T. 656–57; Court's Exh. 1, pars. 121, 122.

French teacher.[199] Prior to teaching at Goshen, she worked for the Berne-Knox-Westerlo Central School (Berne), also located in New York, from 1965 to 1978 where she taught French, English and Latin.[200] The record reveals that her experience in the public education system was by no means limited to teaching. While employed at the Berne school system, Gisondi served an administrative internship at the high school; was president of the teachers' association for two years; and served as labor contract negotiator for the same association for four years. She also served as chairperson of the budget public relations committee of the board of education.[201] Additionally, Gisondi had other experience which was relevant to the assistant principal position. Her experience in the discipline field included work for two summers at St. Anne's Institute, a correctional school for girls, located in Albany, New York.[202] Gisondi testified that when she was serving an internship at the Berne system she was also involved in discipline and counseling of students;[203] that she served as department chairman responsible for supervising and evaluating teachers and that even though after 1971 she no longer held the chairman's position, she still maintained a supervisory role in that function.[204]

Gisondi also had scheduling and curriculum development experience. She cited her experience: at St. Anne's her duties were for the most part assisting the director in operating the summer program; her involvement in preparing a curriculum guide at Berne for a Middle States evaluation; her editorial work on the questions for the New York Regents French Examination in the summer of 1974; and her general scheduling experience at Berne.[205]

The record also reveals that Gisondi was actively involved in the non-academic aspect of the school environment. She had served at Berne as an advisor to the junior and senior classes, the student council and the ski club.[206] She testified that her extra-curricular involvement also included work with the year book, responsibility for the cheerleaders, and supervision of the annual senior class trips.[207]

When Gisondi applied for the assistant principal position her educational qualifications consisted of a B.A. degree in French (in 1965) and a M.A. degree in English (in 1968). Both degrees were received from the State University of New York at Albany. She had also earned forty-four additional credits in education administration during 1973–1976 from Albany. Further, Gisondi possessed certification as a school district administrator and a school administrator and supervisor.[208]

As Gisondi was not employed by the district prior to her appointment, the persons who played a part in the selection had no direct proof of her actual performance in the various roles she had performed. Nevertheless, her reference letters, written by her superiors at Berne, indicate that Gisondi was considered a dependable, reliable teacher who performed duties beyond what was considered usual, serving on committees and performing advisory duties as hereinabove detailed. It was also felt by her former superiors that she was respected by and related well to the students and had an ability to work easily with others exhibiting tact and poise.[209]

\* \* \* \*

Since no purpose would be served by repeating the precedents heretofore stated

199. Court's Exh. 1, par. 125.

200. Court's Exh. 1, par. 127.

201. Defendants' Exh. 184–a; Court's Exh. 1, pars. 128, 131, 132.

202. T.T. 988; Court's Exh. 1, par. 129.

203. T.T. 988.

204. T.T. 988–89.

205. T.T. 983; 986; 988–92; Court's Exh. 1, par. 130.

206. Court's Exh. 1, par. 131.

207. T.T. 995–98.

208. Court's Exh. 1, pars. 123, 124.

209. Defendants' Exhs. 191, 192.

(see "c.", *supra*), we turn to our analysis in light of those principles already enunciated.

Murphy again argues and we agree that she has made out a prima facie showing with respect to the 1979 assistant principalship. As none of the job requirements nor Murphy's experiences (save an additional year's teaching experience) have changed since her application for the 1978 assistant principal position, our analysis is the same: that on the basis of her race and/or sex, Murphy has shown that she is within the class protected by Title VII; that by education and experience she was qualified for the position of assistant principal for which the district was seeking applicants in 1979; that despite this, she was rejected in lieu of the district's ultimate 1979 choice, Mary Gisondi. Again we are constrained to note, that although Murphy clearly was not the "perfect" candidate for the job, she fell within the general group who by education and experience could perform this function.

The district for its part remains steadfast. It argues that Mary Gisondi was the best overall choice for the post; that the selection process was fair and neutral in all respects; and that race and/or sex did not form the basis of their decision not to promote Murphy.

Gisondi's qualifications for this job were effectively presented by her own articulate testimony which was bolstered by credible and convincing documentary proof introduced at trial. At the time of her application for this position, Gisondi had five (5) years more teaching experience than Murphy. Further, she had credible, tangible experience in the areas of discipline, scheduling, curriculum, teacher supervision and evaluation, and the budgetary process. Additionally, the participation in and support of extra-curricular activities only added to her clear sense of complete dedication and professionalism which characterized her work. Of course, we do not find that Murphy's approach to her work was any different. Rather and only that the district was well within its rights in 1979 to choose Gisondi above Murphy or any other applicant. We find no evidence inappropriate with our conclusion here that Gisondi was a legitimate and lawful selection for the post. We would be sadly remiss if we failed to observe that among the many impressive witnesses who took the stand, Gisondi's testimony "stood out" sharply.

As to the selection process employed by the district, we are again forced to conclude that in no wise did race and/or sex form a basis of the district's decision. Simply put, the selection process used here emphasizes fairness and neutrality. The fact that the precise details of implementation for this selection process are different than those of the 1978 process is of no significance. We are unaware of any Title VII requirement which imposes the inflexibility and burden of a consistent selection process in this factual context. Further, as discussed *infra*, this is no evidence of pretext or discriminatory motive; and is only evidence of the reality of the district's decision to avoid further Title VII litigation. Again, the articulated, underlying policy which formed the basis of the district's procedure was only that the procedure foster ultimate selections on the basis of merit and likelihood of success.

After much advertisement of the availability of this position and initial "paper" screening, Palgutta and Leone selected seventeen applicants (including all applicants with the requisite degrees and certification within the district) for interviews.[210] Murphy's interview [211] (as with her ·1978 interview) apparently did not go well. The sentiment of those present (except Mary Jane Elia, Murphy's longtime friend) was one of disappointment. Ultimately, after the committee reviewed the qualifications and per-

---

210. Murphy's argument that she had to be qualified for this (or the 1978) position or she would not have been interviewed misconceives the factual reality and is totally unwarranted. *See* Plaintiff's Reply Brief, p. 25.

211. The fact that four of the seven persons (as the written policy called for) constituted the entirety of the screening committee is not significant. Committee members volunteered for this task and apparently only four did so.

formance of all those interviewed, Murphy was eliminated from consideration. The total trial record to this point is devoid of any proof that this decision was in any sense discriminatory.

The committee then recommended six (6) candidates to Palgutta and Edwards who again interviewed them. Three finalists were selected: a white female, a black female and a black male. By any applicable standard this result objectively indicates that race and/or sex did not enter into consideration. The district's ultimate choice—one from among three qualified finalists—came only after two separate votes because the initial vote ended in a tie. Even at this late stage in the process, race and/or sex could not have motivated the district's decision as evidenced by the undisputed fact of a tie between *two* of the three finalists. It is equally axiomatic that this process did not operate to discriminate against Murphy on the basis of her race and/or sex. The clear, credible and convincing proof adduced indicates only that Murphy was rejected in lieu of a candidate who presented better overall qualifications, and not as a result of any discriminatory practices.

As to Murphy's arguments of pretext, we are unable to find any proof (much less a preponderance of proof) which supports her conclusions. First, Murphy argues that Gisondi was not the most qualified of the three finalists and that alone is evidence of discrimination against her. The underlying assumption in this argument necessarily eliminates its conclusion in this context. That is, the district made its selection from among three qualified applicants. Murphy has not, nor could not, argue or adduce proof to the effect that any of the finalists were *not* qualified for this position. Further, the progeny of *McDonnell Douglas* makes clear that we cannot on Title VII

grounds interfere with an employer's choice from among qualified individuals without evidence of discrimination. We are unwilling to accept the inference that Murphy suggests. The district's selection of Gisondi over the other finalists is no proof whatever of discrimination against Murphy.

Next, Murphy argues that traditionally assistant principal vacancies were filled by "in-district" candidates and because Gisondi was from outside the district, this is further evidence of discrimination against Murphy. In this employment discrimination suit, it is inconceivable (in fact offends *McDonnell Douglas* principles) that the validity of such a theory should be entertained. Of course, the district could not maintain such a discriminatory policy. Further, there is absolutely no proof that such a policy existed *ab initio*.

Finally,[212] Murphy argues that the cumulative impact on her of the totality of the entire situation presented is tantamount to a finding of "institutional discrimination" against her not alone for this position but in general as well.[213]

The simple fact that Murphy was denied a promotion on three separate occasions by the district in lieu of three white applicants (two males and one female) is not evidence of discrimination. As we see it, this is only evidence of the district's legitimate and lawful assessment of the totality of the picture presented by Murphy and the other applicants. We are unable to detect any animosity on the part of the district against Murphy. Rather by objective evidence we can only conclude that on the whole Murphy's superiors liked and encouraged her in her work. But to conclude (as apparently Murphy has) that she was entitled to any one of these three positions, on the basis of her past experience and performances at interviews, is to diminish the high quality of merit.

**212.** Murphy's argument regarding the statistics introduced at trial as heretofore stated does not in any way add to her case. Further, Murphy's arguments regarding the affirmative action program's impact here has been disposed of (*see, supra*).

**213.** We are unaware of any authority to sustain the proposition that we can make a *general* finding of discrimination against the district in a disparate treatment case. However, even if we could, the record is barren (by inference or otherwise) of any evidentiary support of such a theory.

Additionally, we attribute no significance whatever to any argument that because the selection process was different (in an absolute sense) as each vacancy occurred, Murphy was discriminated against.[214] Title VII does not impose such a restriction nor do the district's own policies. The totality of the proof adduced leaves uncontroverted the fact that Murphy has failed to sustain her burden of proving by a fair preponderance of the credible evidence that discriminatory motive infected this or any aspect of the district's three decisions not to promote her.

### f. Murphy's Title VI claim

■ In addition to her other claims of discrimination, Murphy argues that the district may also be held liable under Title VI [215] as it is the recipient of federal funds. Further, Murphy argues that she has the right to bring a private claim for relief under this title and her burden of proof is only to show that the "effect" of the district's practices were discriminatory (which the district must rebut through a showing of a "compelling interest").[216]

For their part, the district argues that Murphy has no standing under Title VI as she is not a direct beneficiary or participant of the federal programs; and even if we were to find that she had standing, her burden (which the district maintains can never be met) is to prove intentional, purposeful discrimination.[217]

Section 601 of Title VI provides:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

The general prohibitions against discrimination is limited by § 604 of Title VI which states:

Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment.

42 U.S.C. § 2000d–3.

■ Even though the very words of § 604 expressly curtail the actions of "any department or agency," its prohibitions have been interpreted to apply to private actions. *Carmi v. Metropolitan St. Louis Sewer Dist.*, 620 F.2d 672, 674–75 (8th Cir. 1980), *cert. denied*, 449 U.S. 892, 101 S.Ct. 249, 66 L.Ed.2d 117; *Tragesar v. Libbie Rehab. Center, Inc.*, 590 F.2d 87, 88–89 (4th Cir. 1978), *cert. denied*, 442 U.S. 947, 99 S.Ct. 2895, 61 L.Ed.2d 318. Private actions however have been allowed to proceed if: (1) the primary objective of the federal program is to provide employment; or (2) employment discrimination necessarily causes discrimination against the primary beneficiaries of the federal programs. *Tragesar, supra*, 590 F.2d at 89.

In the present action, the parties have stipulated as to the federal programs from which the district receives financial assistance: [218] Title I of the Elementary and Secondary Education Act of 1965, 20 U.S.C. § 2701 et seq; Title VII of the Elementary and Secondary Education Act of 1965, 20 U.S.C. § 3221 et seq.; the Gifted and Talented Children's Education Act of 1978, 20 U.S.C. § 3311 et seq.; and the Headstart Program, 42 U.S.C. § 2921 et seq.

---

**214.** In her post trial brief plaintiff's counsel describes the district's community as, "... a small rural type white community—to a large extent reminiscent of a sleeply [sic] southern municipality...." Further that Murphy was denied these positions (especially the Leone, personnel director's job) because of the "... old boy/new boy system of advancement...." Plaintiff's Post Trial Reply Brief, p. 29.

**215.** 42 U.S.C. § 2000d et seq.

**216.** Plaintiff's Post Trial Memorandum, pp. 26–33.

**217.** Defendants' Post Trial Reply Memorandum, pp. 16–24.

**218.** Court's Exh. 1, par. 13.

Under these programs we find that the primary objective of Congress, as evidenced by their clearly articulated intent, was to provide aid to students, children and their families. Title I of the E.S.E.A. is directed towards, "... the special education needs of children of low income families...."[219]; Title VII of the E.S.E.A. states its purpose is to, "... encourage the establishment and operation ... of educational programs using bilingual educational practices...."[220]; the Gifted and Talented Children's Education Act is to, "... meet the special educational needs of gifted and talented children...."[221]; and the Headstart Program is designed to provide, "... a comprehensive health, educational, nutritional, social, and other services to economically disadvantaged children and their families...."[222]

It is axiomatic that none of these programs were designed with the primary objective of providing employment.

Furthermore, plaintiff has failed to offer any proof or argument of how discrimination directed at her[223] would "necessarily discriminate against the primary beneficiaries of the federal aid." *Tragesar, supra,*

590 F.2d at 89. Therefore we are compelled to find that Murphy has failed completely to sustain her burden of proving that she has standing to bring this Title VI claim.

Assuming, arguendo, that Murphy had standing to advance this Title VI based employment discrimination claim, the result would nevertheless be the same. For Murphy to prevail she would have to show that she was a victim of purposeful discrimination.[224] *Lora v. Board of Ed. of the City of New York,* 623 F.2d 248, 250 (2d Cir. 1980). *See also, Bryan v. Koch,* 492 F.Supp. 212 (S.D.N.Y.1980), *affirmed,* 627 F.2d 612 (2d Cir.). As heretofore stated, Murphy has adduced no credible proof whatever of discriminatory motive on the part of the district; and therefore she has failed overwhelmingly to present any showing of purposeful discrimination.

### Conclusion

Throughout the entire trial (lasting eight trial days) we were impressed indeed by the forthright, articulate and credible testimony of many of defendants' witnesses: Mary Jane Gisondi, John L. Krause, Domenic Leone and Frank Schuerholz.[225] Their presentation of the multifarious problems that

219. 20 U.S.C. § 2701.

220. 20 U.S.C. § 3222(a)(7)(A).

221. 20 U.S.C. § 3311(c).

222. 42 U.S.C. § 2922.

223. The primary beneficiaries of the above mentioned programs are the school children. In certain instances discrimination at the teacher level can operate to discriminate against the students. *See, e. g., Caulfield v. Board of Ed. of the City of New York,* 583 F.2d 605, 610–11 (2d Cir. 1978) (discriminatory employment practices had effect that school children were taught by teachers of less experience and fewer degrees); *United States v. Jefferson County Bd. of Ed.,* 372 F.2d 836, 882–83 (5th Cir. 1966) (racial make-up of faculty effects desegregation efforts and the student body). The only argument that Murphy could conceivably make is that the district discriminated against the student body in not promoting her on three separate occasions. Yet we find a marked absence of any proof on this issue.

224. We recognize that there is some debate regarding plaintiff's burden in a Title VI claim. *See Bryan v. Koch,* 627 F.2d 612, 616 (2d Cir. 1980). Even if we were to find that Murphy's

only burden was to prove that the district's practices had a discriminatory effect our conclusion would be the same. The district has a compelling interest in promoting what it believes to be the best overall qualified individual for any position.

225. Example: Testimony at trial by Mary Jane Gisondi:

Q. Would you tell the Court, briefly, your administrative experience as of your applying in 1979 for your current position?

A. During my internship, which was the '75/'76 school year, I was involved with a majority of the internships involved with curriculum and scheduling. Also, in the summer, I was counselor listed at St. Ann's Institute, which is a correctional school for girls in the City of Albany. I worked there really three summers, mainly involved with programming, assisting the director in the running of the summer program.

. . . .

Q. Did you have experience as of 1979 in collective negotiations?

A. From 1969 to 1973 I was a contract negotiator at Byrne-Knox-Westerle Central School.

Q. On behalf of which group?

A. On behalf of the teachers' union, teachers' association.

intertwine the teaching profession, the up-right selection methods they adopted, etc. aided us in the performance of our judicial function.

Q. And have you served in any office in the teachers' association?
A. From 1971 through 1973 I was president of the organization.
. . . .
Q. Did you have any experience in communication, in public relations?
A. When I did my internship we were on an austerity budget, and the Board of Education, as part of my internship, asked me to serve as public relations chairman, to get the public to approve a budget.
Q. Did you have experience as of 1979 in curriculum?
A. Yes. During my tenure years at Byrne-Knox I was in charge of writing a curriculum guide and also behavioral objectives for Middle States reevaluation.
Q. Did you have any experience on a state-wide level in such matters?
A. During the summer of 1975 I worked for the State Education Department as one of two people from the State who selected and edited the questions for the 1975 French regents. It was the summer of 1974.
(T.T. 983; 985–86)
By John L. Krause:
Q. Now, can you tell us in general terms what are the responsibilities and function of the director of personnel?
A. The director of personnel is responsible for administering all of the personnel functions in the School District. This involves coordinating and overseeing the entire selection process, promotion procedures, hiring and firing, establishing necessary qualifications, procedures, working with principals, teachers, university placement officers, the entire selection and recruitment and evaluation process.

The personnel director is also responsible for general supervision and coordination of the District's employee relations procedures, either in formal negotiations—not always as the direct spokesperson, but has general responsibility for that, in the formal bargaining units as well as the informal bargaining procedures with other employee units.

The personnel director is also responsible for overseeing such procedures as maintaining the proper records, complying with the Federal regulations, with State regulations, with School District policies in all matters relating to personnel, with administering the whole salary schedule and fringe benefit program, overseeing the related costs and implications of budgetary requests as they relate to personnel and, in toto, the whole personnel function. (T.T. 567–68)
By Domenic Leone:

We are well aware of the sensitivity and meticulousness which a Title VII claim demands of the finder of fact. We endeavored to the utmost throughout this opinion

Q. And this curriculum then governed what was taught throughout all the grades?
A. Correct.
Q. Do I understand that correctly?
A. That's correct. And that also served as a basis for the evaluation. I should also point out that the curriculum also serves as a kind of structure in developing the curriculum which I really perceived more as a process, not simply a stipulating of skills sequentially and knowledge that you expect children to have, but rather a process that involves the people who are going to be participating in those development of skills, and I think that is probably the more important aspect of it, in other words, the administration of the curricula and part of what I tried to do was have the curricula, particularly in the elementary level, designed on—I'm trying to think of the expression; it just escaped my mind—but behavioral objective kind of attainment, because I was concerned that following my evaluation of the teachers that they didn't always recognize that to get from here to here you sometimes had many skills to go and they didn't really do a great deal of task analysis, so by going with the program, the behavioral objective type of thing, it became an instructional thing for the teachers as well, and we as a community of teachers and administrators developed this sequence of curricula. (T.T. 812–13)
By Frank Schuerholz:
Q. You have described Eva Murphy's interview. I now ask you whether you formed a judgment as a professional of her performance in that interview. Did you form a judgment?
A. I'm not sure I understand your question when you say a judgment.
Q. An opinion.
A. I had a reaction.
Q. All right. Did you have a reaction to her interview?
A. Yes. I—yes; I did.
Q. And what was that reaction?
A. One of disappointment.
Q. And did you have reasons for your disappointment? Did you feel reasons for your disappointment?
A. Yes; I did.
Q. And what were they?
A. I wanted to see Eva do well, and I felt she hadn't done well in the interview.
Q. That she had done well?
A. That she had not done well.
Q. And in what way had she not done well, according to your feelings?
A. In handling our questions.
(T.T.942–43)

and at trial to find the faintest shadow of discriminatory motive. We have considered and analyzed every piece of evidence adduced for its individual effect and its cumulative impact on the totality of plaintiff's case. We are left with the firmly imbedded proposition that the district in no wise discriminated against Murphy. The persons who filled the positions Murphy desired were qualified educational administrators. The procedure used by the district was eminently fair; each selection process was filled with safeguards so that objectivity as to merit and qualifications could be preserved. As we have heretofore stated, Title VII does not create a preference on the basis of race and/or sex.

As repeatedly stated hereinabove, the district's decision not to promote Murphy was legitimate and lawful, and we so find.

Accordingly, we are constrained to, and do, dismiss the complaint in all respects.

The foregoing constitutes our findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

SO ORDERED.